# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| TIM OPPERMAN, Derivatively on Behalf of CONAGRA BRANDS, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>SEAN M. CONNOLLY, DAVID S. MARBERGER, ROBERT G. WISE, ANIL ARORA, THOMAS K. BROWN, STEPHEN G. BUTLER, JOIE A. GREGOR, RAJIVE JOHRI, RICHARD H. LENNY, RUTH ANN MARSHALL, and CRAIG P. OMTVEDT, )<br><br>Defendants, )<br><br>and )<br><br>CONAGRA BRANDS, INC., )<br><br>Nominal Defendant )  | Case No.:<br><br>**JURY TRIAL DEMANDED** |

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Tim Opperman ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Conagra Brands, Inc. ("Conagra" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Sean M. Connolly, David S. Marberger, Robert G. Wise, Anil Arora, Thomas K. Brown, Stephen G. Butler, Joie A. Gregor, Rajive Johri, Richard H. Lenny, Ruth Ann Marshall, and Craig P. Omtvedt, (collectively, the "Individual Defendants," and together with Conagra, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Conagra, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934

(the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Conagra, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Conagra's directors and officers from at least June 27, 2018 through the present (the "Relevant Period").

2.     Conagra is a Chicago-based consumer packaged food company. The Company purports to be "one of North America's leading branded food companies," boasting a portfolio of iconic brands including Marie Callender's, Reddi-wip, Hunt's, Healthy Choice, Slim Jim, and Orville Redenbacher's.

3.     The Company acquired Ralcorp Holdings, Inc., a large private food manufacturer, for over $6 billion in 2013, but changed its strategic direction and divested its Private Brands business towards the end of 2016, resulting in a substantial loss. In 2018, Conagra set out to acquire another significant publicly traded food company, Pinnacle Foods, Inc. ("Pinnacle"),

another corporation specializing in branded packaged foods. Pinnacle's top brands include Duncan Hines, Vlasic, Mrs. Butterworth's, and Bird's Eye.

4.     On June 27, 2018, the Company issued a press release announcing a definitive agreement between Conagra and Pinnacle in which Conagra would acquire all the outstanding shares of Pinnacle for approximately $10.9 billion, to "accelerate value creation for shareholders[,]" and enhance the Company's presence in its most strategic categories.

5.     In order to finance the considerable cost of the acquisition, Conagra held a second public offering (the "SPO") on October 9, 2018. The SPO consisted of 16,312,057 shares of common stock for $35.25 each. Consistent with the Individual Defendants' false and misleading statements prior to and during the SPO, it was a success. Underwriters even exercised their option to purchase over 1.6 million more shares. Conagra obtained approximately $612 million from this offering.

6.     Throughout the Relevant Period, the Company touted the merger of the "growing portfolios" and promoted the transaction with Pinnacle as a "no brainer of a deal" that would surely advance the Company in strategic business areas, such as frozen food and snacks. Conagra's grand plan was to transform itself and expand its business presence. The Company promoted its own efforts in connection with the supposedly strategic deal, emphasizing its due diligence and the advantageous aspects of the agreement. Through press releases and earnings calls, the Company boasted that the acquisition was of "a portfolio of complementary, leading brands" and assured the investing public that the integration process would be smooth.

7.     However, on December 20, 2018, Conagra issued a press release and held a conference call to discuss its results for the fiscal quarter ended November 25, 2018 revealing

that Pinnacle had performed poorly since the acquisition. Conagra was forced to admit that this was due to internal issues that had existed pre-acquisition.

8.     Also on December 20, 2018, JP Morgan released an analyst report noting Conagra's clearly inadequate due diligence investigation before the Company's acquisition of Pinnacle.

9.     The following day, on December 21, 2018, another analyst report was released, this time by RBC Capital Markets, remarking on the serious, unforeseen issues that Conagra had encountered in its short ownership of Pinnacle.

10.     On this news, the price per share of Conagra stock plummeted over 16%, dropping $4.81 to close at $24.28 on December 20, 2018 from a close of $29.09 on December 19, 2018. The price continued to drop the next day, dipping another $2.13 to close at $22.15 on December 21, 2018. Conagra's stock declined a total of 28% over three trading days, finally closing at $20.96 on December 24, 2018.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public related to Conagra's acquisition of Pinnacle that failed to disclose, *inter alia*, that: (1) the Company did not conduct sufficient due diligence before acquiring Pinnacle; (2) Pinnacle's top brands were weakening due to internal problems of innovation and execution rather than external market pressures; (3) Pinnacle's situation was so desperate that it had been reduced to offering its retailers discounts to improve its sales figures; and (4) the Company failed to maintain internal controls. As a result of

the foregoing, the Company's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

13.     Furthermore, during the Relevant Period, one of the Individual Defendants breached their fiduciary duties by engaging in insider sales, netting proceeds of over $216,084.

14.     In light of the Individual Defendants' misconduct, which has subjected Conagra, several of its Board members (including its CEO), its Chief Financial Officer ("CFO"), and its controller to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Conagra's Board of Directors (the "Board") cannot consider a demand to commence litigation

against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

17.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

22.     Venue is proper in this District because Conagra and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.    Plaintiff is a current shareholder of Conagra common stock. Plaintiff has continuously held Conagra common stock at all relevant times.

### Nominal Defendant Conagra

24.    Conagra is a Delaware corporation with its principal executive offices at 222 Merchandise Mart Plaza, Suite 300 Chicago, Illinois, 60654. Conagra's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CAG."

### Defendant Connolly

25.    Defendant Sean M. Connolly ("Connolly") has served as Conagra's President and CEO, as well as a Company director, since April 6, 2015. He also serves as a member of the Executive Committee. According to the 2018 Proxy Statement, as of July 31, 2018 Defendant Connolly beneficially owned 1,354,237 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 31, 2018 was $36.71, Defendant Connolly owned approximately $49.7 million worth of Conagra stock.

26.    For the fiscal year ended May 27, 2018 Defendant Connolly received $10,473,271 in compensation from the Company. This included $1,142,308 in salary, $6,676,835 in stock awards, $2,250,000 in non-equity incentive plan compensation, and $404,128 in other compensation.

27.    The Company's 2018 Proxy Statement stated the following about Defendant Connolly:

> Mr. Connolly has served as our President and Chief Executive Officer and a member of the Board since April 6, 2015. Previously, he served as President and Chief Executive Officer and a director of The Hillshire Brands Company (a branded food products company) from June 2012 to August 2014. Before becoming CEO of Hillshire, Mr. Connolly served as Executive Vice President of

Sara Lee Corporation (a branded food products company) and Chief Executive Officer, Sara Lee North American Retail and Foodservice. Prior to joining Sara Lee in anticipation of the spin-off of Hillshire, Mr. Connolly served as President of Campbell North America, the largest division of Campbell Soup Company (a branded food products company); President, Campbell USA; and President, North American Foodservice for Campbell. Before joining Campbell in 2002, he served in various marketing and brand management roles at The Procter & Gamble Company (a branded consumer product goods company).

*Other public company directorships:*

- The Hillshire Brands Company (as President and CEO) from June 2012 to August 2014

## Defendant Marberger

28.     Defendant David S. Marberger ("Marberger") has served as the Company's CFO and Executive Vice President since August 2016. According to the Company's 2018 Proxy Statement as of July 31, 2018 Defendant Marberger beneficially owned 27,917 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 31, 2018 was $36.71, Defendant Marberger owned over $1 million worth of Conagra stock.

29.     For the fiscal year ended May 27, 2018 Defendant Marberger received $3,027,429 in compensation from the Company. This included $639,231 in cash fees, $1,582,062 in stock awards, $715,107 in non-equity incentive compensation, and $91,029 in other compensation.

30.     The Company's 2018 Proxy Statement stated the following about Defendant Marberger:

> <u>Mr. David S. Marberger</u>. Mr. Marberger has served as our Executive Vice President and Chief Financial Officer since August 2016. As Chief Financial Officer, Mr. Marberger is our Principal Financial Officer, leads all Finance functions for the company, heads our Investor Relations department and has accountability for the Information Technology function. The Committee considered the broad scope of Mr. Marberger's responsibilities, his previous experience as a Chief Financial Officer, his in-depth knowledge of the food industry, internal pay equity, and external market data in setting his compensation for fiscal 2018.

**Defendant Wise**

31.     Defendant Robert G. Wise ("Wise") was appointed as the Company's corporate controller, Principal Accounting Officer, and Vice President on January 17, 2012.

**Defendant Arora**

32.     Defendant Anil Arora ("Arora") has served as a Company director since July 17, 2018. Defendant Arora also serves as a member of the Audit/Finance Committee.

33.     The Company's Schedule 14A filed with the SEC on August 9, 2018 (the "2018 Proxy Statement"), stated the following about Defendant Arora:

> Mr. Arora has served as a director and Vice Chairman of Envestnet, Inc. (a cloud based financial technology, data intelligence and wealth management company) and Chief Executive of Envestnet | Yodlee since November 2015. Prior to that, he served as President, Chief Executive Officer and a director of Yodlee, Inc. (a data intelligence and financial technology products provider) from February 2000 until its initial public offering in March 2014 and as Chairman of the board of directors of Yodlee, Inc. from March 2014 until November 2015. Prior to joining Yodlee, Mr. Arora served in various positions with Gateway, Inc. (a computer hardware manufacturer). Earlier in his career, Mr. Arora served in various strategy and marketing positions for The Pillsbury Company (a manufacturer and marketer of branded consumer foods) and Kraft Foods Group, Inc. (a manufacturer and marketer of branded consumer foods).

> *Other public company directorships:*
> - Envestnet, Inc. since November 2015
> - Yodlee, Inc. (as Chairman) from March 2014 until November 2015

**Defendant Brown**

34.     Defendant Thomas K. Brown ("Brown") has served as a Company director since October 15, 2013. He also serves as a member of the Audit/Finance Committee. According to the 2018 Proxy Statement, as of July 31, 2018 Defendant Brown beneficially owned 19,385 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 31, 2018 was $36.71, Defendant Brown owned approximately $711,623 worth of Conagra stock.

35.     For the fiscal year ended May 27, 2018 Defendant Brown received $249,650 in compensation from the Company. This included $100,000 in cash fees and $149,650 in stock awards.

36.     The Company's 2018 Proxy Statement stated the following about Defendant Brown:

> Mr. Brown served as Group Vice President, Global Purchasing with Ford Motor Company (a motor vehicles manufacturer) from 2008 until his retirement in August 2013. He joined Ford Motor Company in 1999 and served in various leadership capacities in global purchasing during his tenure. Prior to joining Ford Motor Company, he served in leadership positions at United Technologies Corporation (as Vice President, Supply Chain), QMS, Inc. and Digital Equipment Corporation.
> *Other public company directorships:*
>
> - 3M Company (a global innovation company) since August 2013
> - Tower International, Inc. (a metal component manufacturing company) since April 2014; has served as non-executive Chair since 2017

**Defendant Butler**

37.     Defendant Stephen G. Butler ("Butler") has served as a Company director since May 16, 2003. He also serves as a member of the Executive Committee and as the Chair of the Audit/Finance Committee. According to the Company's 2018 Proxy Statement as of July 31, 2018 Defendant Butler beneficially owned 75,695 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 31, 2018 was $36.71, Defendant Butler owned approximately $2.78 million worth of Conagra stock.

38.     For the fiscal year ended May 27, 2018 Defendant Butler received $279,650 in compensation from the Company. This included $120,000 in cash fees, $149,650 in stock awards, and $10,000 in other compensation.

39.     The Company's 2018 Proxy Statement stated the following about Defendant Butler:

Mr. Butler is the retired Chairman and CEO of KPMG LLP (a national public accounting firm), a role he held from 1996 until June 2002. He also served as Chairman of KPMG International from 1999 until his retirement. He held a variety of management positions, both in the United States and internationally, during his 34-year career at KPMG.

*Other public company directorships:*
- Cooper Industries plc (an electrical products manufacturer) from 2002 until 2012
- Ford Motor Company (a motor vehicles manufacturer) since 2004

**Defendant Gregor**

40.     Defendant Joie A. Gregor ("Gregor") has served as a Company director since February 6, 2009. She also serves as a member of the Executive Committee and the Audit/Finance Committee, and as the Chair of the Nominating, Governance and Public Affairs Committee. According to the 2018 Proxy Statement, as of July 31, 2018 Defendant Gregor beneficially owned 37,775 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 31, 2018 was $36.71, Defendant Gregor owned approximately $1.39 million worth of Conagra stock.

41.     For the fiscal year ended May 27, 2018, Defendant Gregor received $264,150 in compensation from the Company. This included $104,500 in cash fees, $149,650 in stock awards, and $10,000 in other compensation.

42.     The Company's 2018 Proxy Statement stated the following about Defendant Gregor:

Ms. Gregor served as a Managing Director with Warburg Pincus LLC (a private equity investment firm) from 2014 until 2016. In this role, she provided organizational guidance and strategic direction across all firm investing areas. Before her time with Warburg Pincus, Ms. Gregor's professional experience included the following:
- From 2007 to 2008, Assistant to the President of the United States for Presidential Personnel under President George W. Bush
- From 2002 to 2007, Vice Chairman of Heidrick & Struggles International, Inc. (an executive search firm). Ms. Gregor's tenure at Heidrick & Struggles International began in 1993 and she served in a number of senior leadership

11

roles, including as President, North America, managing partner of the firm's Global Board of Directors Practice as well as a member of the management committee.

▪ Ms. Gregor began her career with IBM Corporation, where she held a variety of leadership positions of increasing responsibility over a 13-year period.

*Other public company directorships*:

▪ Conduent Incorporated (a business process services company) since 2016

**Defendant Johri**

43.     Defendant Rajive Johri ("Johri") has served as a Company director since January 1, 2009. Defendant Johri also serves as a member of the Human Resources Committee and the Nominating, Governance and Public Affairs Committee.

44.     According to the 2018 Proxy Statement, as of July 31, 2018 Defendant Johri beneficially owned 4,270 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 31, 2018 was $36.71, Defendant Gregor owned approximately $156,751 worth of Conagra stock.

45.     For the fiscal year ended May 27, 2018, Defendant Johri received $259,650 in compensation from the Company. This included $100,00 in cash fees, $149,650 in stock awards, and $10,000 in other compensation.

46.     The Company's 2018 Proxy Statement stated the following about Defendant Johri:

Mr. Johri served as President and Director of First National Bank of Omaha (a banking institution) from 2006 until his retirement in 2009. From September 2005 to June 2006, Mr. Johri served as President of First National Credit Cards Center for First National Bank of Omaha. Prior to that, he served as an Executive Vice President for J.P. Morgan Chase Bank (a banking institution) from 1999 until 2004.

*Other public company directorships*:

▪ Charter Communications Inc. from 2006 until 2009

**Defendant Lenny**

47.     Defendant Richard H. Lenny ("Lenny") has served as a Company director since March 17, 2009 and as Conagra's Nonexecutive Chairman since May 28, 2018. He also serves as a member of the Executive Committee, the Human Resources Committee, and the Nominating, Governance and Public Affairs Committee. According to the 2018 Proxy Statement, as of July 31, 2018 Defendant Lenny beneficially owned 53,826 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 31, 2018 was $36.71, Defendant Lenny owned approximately $1.98 million worth of Conagra stock.

48.     For the fiscal year ended May 27, 2018, Defendant Lenny received $279,650 in compensation from the Company. This included $120,000 in cash fees, $149,650 in stock awards, and $10,000 in other compensation.

49.     The Company's 2018 Proxy Statement stated the following about Defendant Lenny:

> Mr. Lenny served as Chairman, President and Chief Executive Officer of The Hershey Company (manufacturer, distributor and marketer of candy, snacks and candy-related grocery products) from 2001 to 2007. Prior to joining The Hershey Company, Mr. Lenny served as group vice president of Kraft Foods, Inc. (a packaged food company) and as President of Nabisco Biscuit Company (a packaged food company). Mr. Lenny currently serves as non-executive Chairman of Information Resources, Inc. (a market research firm), a position he has held since 2013. He served as a senior advisor with Friedman, Fleischer & Lowe, LLC (a private equity firm) from 2014 until 2016 and as an operating partner from 2011 until 2014.
> *Other public company directorships*:
> ▪ Discover Financial Services (a direct banking and payment services firm) from 2009 until 2018
> ▪ Illinois Tool Works Inc. (a global manufacturer of industrial products and equipment) since 2014
> ▪ McDonald's Corporation (a retail eating establishment) since 2005

**Defendant Marshall**

50.     Defendant Ruth Ann Marshall ("Marshall") has served as a Company director since March 23, 2007. She also serves as a member of the Executive Committee and the Nominating, Governance and Public Affairs Committee and as the Chair of the Human Resources Committee. According to the 2018 Proxy Statement, as of July 31, 2018, Defendant Marshall beneficially owned 23,288 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 31, 2018 was $36.71, Defendant Marshall owned approximately $854,902 worth of Conagra stock.

51.     For the fiscal year ended May 27, 2018, Defendant Marshall received $279,650 in compensation from the Company. This included $120,000 in cash fees, $149,650 in stock awards, and $10,000 in other compensation.

52.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Marshall made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| July 5, 2018 | 3,023 | $   35.15 | $   106,258.45 |
| July 9, 2018 | 3,023 | $   36.33 | $   109,825.59 |

Thus, in total, before the fraud was exposed, she sold 6,046 shares on inside information, for which she received approximately $216,084. Defendant Marshall's insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

53.     The Company's 2018 Proxy Statement stated the following about Defendant Marshall:

14

Ms. Marshall was President of the Americas at MasterCard International, Inc. (payments industry) from October 1999 until her retirement in June 2006. At MasterCard, Ms. Marshall was responsible for building all aspects of MasterCard's issuance and acceptance business in the United States, Canada, Latin America and the Caribbean. Prior to joining MasterCard International, Inc., Ms. Marshall served as Senior Executive Vice President of Concord EFS, Inc. (an electronic payment services company), where she oversaw marketing, account management, customer service and product development.

*Other public company directorships:*
- Global Payments Inc. (a provider of payment technology services) since 2006
- Regions Financial Corporation (a financial holding company) since 2011

**Defendant Omtvedt**

54.     Defendant Craig P. Omtvedt ("Omtvedt") has served as a Company director since November 11, 2016. He also serves as a member of the Audit/Finance Committee. According to the 2018 Proxy Statement, Defendant Omtvedt beneficially owned 5,868 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 31, 2018 was $36.71, Defendant Omtvedt owned approximately $215,414 worth of Conagra stock.

55.     For the fiscal year ended May 27, 2018, Defendant Omtvedt received $259,650 in compensation from the Company. This included $100,000 in cash fees, $149,650 in stock awards, and $10,000 in other compensation.

56.     The Company's 2018 Proxy Statement stated the following about Defendant Omtvedt:

Mr. Omtvedt served as Senior Vice President and Chief Financial Officer of Fortune Brands, Inc. (a former leading consumer products company) from 2000 until his retirement in October 2011. He served as a consultant to Beam Inc., the successor to Fortune Brands, during 2012. Previously, Mr. Omtvedt held a series of finance leadership positions of increasing responsibility with Fortune Brands, including Senior Vice President and Chief Accounting Officer; Vice President and Chief Accounting Officer; and Vice President, Deputy Controller and Chief Internal Auditor. He first joined Fortune Brands in 1989. Before joining Fortune

Brands, Mr. Omtvedt served in financial positions of increasing responsibility at both The Pillsbury Company and Sears, Roebuck & Company.

*Other directorships:*

- General Cable Corp. (a wire and cable manufacturer) from 2004 until 2018
- The Hillshire Brands Company from 2012 until 2014
- Oshkosh Corporation (a manufacturer and marketer of specialty vehicles and vehicle bodies), since 2008; current non-executive Chairman of the Board

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

57. By reason of their positions as officers, directors, and/or fiduciaries of Conagra and because of their ability to control the business and corporate affairs of Conagra, the Individual Defendants owed Conagra and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Conagra in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Conagra and its shareholders so as to benefit all shareholders equally.

58. Each director and officer of the Company owes to Conagra and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

59. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Conagra, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

60. To discharge their duties, the officers and directors of Conagra were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

61. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Conagra, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Conagra's Board at all relevant times.

62.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

63.     To discharge their duties, the officers and directors of Conagra were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Conagra were required to, among other things:

17

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to Conagra's own Code of Conduct;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Conagra conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Conagra and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Conagra's operations would comply with all applicable laws and Conagra's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

64.      Each of the Individual Defendants further owed to Conagra and the shareholders the duty of loyalty requiring that each favor Conagra's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

65.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Conagra and were at all times acting within the course and scope of such agency.

66.      Because of their advisory, executive, managerial, and directorial positions with Conagra, each of the Individual Defendants had access to adverse, non-public information about the Company.

67.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Conagra.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

68.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

69.      The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

70.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Conagra, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

71.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

72.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Conagra and was at all times acting within the course and scope of such agency.

**CONAGRA'S CODE OF CONDUCT**

73.     Conagra's Code of Conduct (the "Code of Conduct"), states that, "[m]embers of our board of directors are bound by it. So are all of our employees," including the senior officers who are also bound by an additional Code of Ethics.

74.     The Code of Conduct provides that insider trading is illegal and unequivocally

prohibited, stating, in relevant part:

> Employees or associates who possess such material, nonpublic information and
> who take advantage of their position to profit and/or minimize losses by trading
> the company's securities on the basis of such information and at the expense of
> less-informed investors may be held criminally and civilly liable. Any employee
> or associate who is aware of material nonpublic information related to Conagra
> Brands, or to companies with which Conagra Brands is in confidential
> discussions, may not buy or sell common stock of Conagra Brands or of such
> other company... ***Many senior-level Conagra Brands employees and all
> members of its board of directors are subject to additional, special rules and
> laws on insider trading.*** These individuals can buy or sell Conagra Brands'
> common stock during limited periods following the release of quarterly or annual
> earnings information. The company advises such individuals when the "window"
> periods are open on a quarterly basis. ***Conagra Brands also prohibits any
> member of the board of directors or senior or executive officer from buying or
> selling any of its securities without obtaining prior approval from its general
> counsel and corporate secretary***. This seeks to assure that those individuals will
> not trade in its securities at a time when they are in possession of inside
> information.

(Emphasis added).

75.     The Code of Conduct contains a section relating to the Company's policies on

"Dealing with [its] communities and governments," wherein it emphasizes "compliance with all

applicable laws and regulations," including ensuring that "[a]ll information provided to

government agencies [is] truthful and accurate."

76.     The Code of Conduct also provides a section on record-keeping which requires

honest and accurate reporting of, *inter alia*, financial statements, Company books, and records:

> The accurate recording of financial information is critical to investors and our
> business managers. Our business practices must be conducted with the highest
> standard of ethical behavior, and our transactions must be accurately and properly
> documented and accounted for. Certain employees and associates have job
> responsibility for accounting for business transactions and preparing accurate
> financial statements. The overall responsibility, however, extends to each and
> every one of us. Each of us must ensure that business transactions are properly
> reflected in the company's books and records and that all transactions are
> documented in a manner consistent with their economic substance. Our
> commitment to the long-term success of Conagra Brands is too important to

sacrifice our reputation by resorting to unacceptable accounting practices. Our policy applies to all records. You cannot make false claims on items such as expense reports, falsify quality or safety results, record false sales or improperly record them early, understate or overstate assets or liabilities, or defer recording items that should be expensed. No entry may be made on the books and records of Conagra Brands that intentionally hides or disguises the true nature of any transaction. Our financial records must conform to Generally Accepted Accounting Principles (GAAP).

## **CODE OF ETHICS FOR SENIOR CORPORATE OFFICERS**

77.     In addition to its Code of Conduct, "which is applicable to all of Conagra Brands' employees," Conagra has an additional Code of Ethics (the "Officer Code of Ethics" and together with the Code of Conduct the "Codes") that applies to its "chief executive officer, chief financial officer, and controller."

78.     The Officer Code of Ethics emphasizes honest and complete disclosures in Conagra's public statements, responsible use of company assets, and compliance with relevant rules, regulations, and laws. Specifically, the Officer Code of Ethics requires that senior corporate officers must:

- Act with honesty and integrity, and ethically handle any actual or apparent conflicts of interest between personal and professional relationships.

* * *

- ***Provide, or cause to be provided, full, fair, accurate, timely and understandable disclosure in reports and documents that Conagra Brands files with, or submits to, the Securities and Exchange Commission and in other public communications made by Conagra Brands.***
- ***Comply with applicable government laws, rules and regulations.***

* * *

- Use, or cause to be used, all corporate assets entrusted to such officer in a responsible manner and in the best interests of Conagra Brands.
- Promote, as appropriate, the provisions of Conagra Brands' Code of Conduct relating to the reporting by employees of improper accounting or financial reporting without fear of retaliation.
- Promptly report any violations of this Code of Ethics to the Audit / Finance Committee, and promote the prompt reporting of violations of the company's Code of Conduct to the persons identified in that Code.

(Emphasis added).

22

79. The Individual Defendants violated the Codes by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, and failing to report the same.

### AUDIT/FINANCE COMMITTEE CHARTER

80. According to the Audit/Finance Committee Charter,[1] the Audit/Finance Committee functions as an arm of the Board and has no additional authority to provide "expert or special assurance as to the Company's financial statements." The Audit/Finance Committee "assist[s] the Board in fulfilling its oversight responsibilities"

81. Two pertinent sections of the charter, entitled "Oversight of Matters Required in Annual Proxy Statement Report" and "Financing Strategy Actions," together indicate that it was the responsibility of the Audit/Finance Committee to investigate Conagra's planned acquisition of Pinnacle and to ensure that all disclosures related to the acquisition were complete and accurate.

82. Finally, the maintenance and monitoring of internal controls is undoubtedly within the purview of the Audit/Finance Committee's oversight:

- The Committee shall meet to review and discuss the Company's quarterly financial statements, including reviewing the specific disclosures made in management's discussion and analysis, with management and the independent auditors.
- The Committee shall review disclosures made by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any

---

[1] https://www.conagrabrands.com/investor-relations/corporate-governance/audit-finance. Last visited July 16, 2019.

fraud involving management or other employees who have a significant role in the Company's internal controls.

83.     Because the Audit/Finance Committee has no separate or elevated authority over the Company's financial statements (which are the responsibility of Conagra's larger management) or to conduct investigations, failings of the Audit/Finance Committee may be imputed to the body from which the Committee derives its power: the entire Board.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

84.     Conagra is a branded consumer packaged foods company that operates in several sectors of the food service industry, including shelf-stable, refrigerated, and frozen foods. The Company operates both in the United States and abroad.

85.     On May 4, 2018, Conagra made an unsolicited, non-binding proposal to acquire 100% of Pinnacle. The Company signed a confidentiality agreement with Pinnacle on May 15, 2018.

86.     On May 30, 2018, in accordance with typical due diligence procedures, Pinnacle granted Conagra access to its virtual data room so that it could view Pinnacle's files, including the details of its past financial performance, before acquisition.

87.     Starting from June 27, 2018, the Company issued multiple statements through SEC filings and press releases promoting its acquisition of Pinnacle. Conagra claimed that the acquisition offered "Compelling Strategic and Financial Benefits," while emphasizing the growth and profitability the alliance would bring to Conagra.

**False and Misleading Statements**

*June 27, 2018 Press Release, Form 8-K, and Conference Call*

88.     On June 27, 2018, Conagra issued a press release attached as an exhibit to its Form 8-K (the "June 2018 8-K"), announcing that the Company had entered into an acquisition agreement with Pinnacle.

89.     The Company's press release touted the "Compelling Strategic and Financial Benefits" of the merger, including its:

- Complementary Portfolio of Iconic Brands: The combined company will have a portfolio of leading, iconic brands within attractive domains such as frozen & refrigerated meals and snacks & sweet treats.
- Enhanced Ability to Capitalize on Trends in Frozen Foods: The combination will bring together complementary portfolios in the large, growing and on-trend frozen foods category, positioning the combined company to accelerate innovation and benefit from long-term tailwinds.
- Compelling Growth Profile: Conagra Brands and Pinnacle Foods are two of the fastest-growing companies in the consumer packaged foods industry by consumption, and Conagra Brands expects continued momentum based on the enhanced scale and new opportunities to partner with customers that the transaction will provide.
- EPS Accretive: On a percentage basis, Conagra Brands expects the transaction to be low single-digit accretive to adjusted EPS in the fiscal year ended May 2020 and high single-digit accretive to adjusted EPS in the fiscal year ended May 2022.
- Significant Synergy Opportunities: Conagra Brands expects to achieve approximately $215 million in annual run-rate cost synergies by the end of fiscal year 2022, with one-time cash costs to achieve the synergies estimated at approximately $355 million, inclusive of expected capital expenditures of approximately $150 million.
- Financing Maintains Solid Investment Grade Credit Rating and Dividend Rate: The transaction is expected to be financed by Conagra Brands equity issued to Pinnacle Foods shareholders, new transaction debt and incremental cash proceeds from a public equity offering and/or divestitures.
- Proven Integration Capabilities: In recent years, Conagra Brands has established a proven track record of executing strategic transactions. The two organizations share complementary portfolios, supply chains, and results-oriented cultures, which are expected to facilitate integration.

90.     The press release also specifically promoted Pinnacle's top brands, stating that:

The combination of two growing portfolios of iconic brands will serve as a catalyst to accelerate value creation for shareholders. The transaction will enhance Conagra Brands' multi-year transformation plan and expand its presence and capabilities in its most strategic categories, including frozen foods and snacks. With annual net sales in excess of $3 billion, Pinnacle Foods' portfolio of frozen, refrigerated and shelf-stable products includes such well-known brands as *Birds Eye, Duncan Hines, Earth Balance, EVOL, Erin's, Gardein, Glutino, Hawaiian Kettle Style Potato Chips, Hungry-Man, Log Cabin, Tim's Cascade Snacks, Udi's, Vlasic* and *Wish-Bone*, among others. Based on both companies' latest fiscal year results, pro forma net sales would have been approximately $11 billion.

91.     Later that day, on Conagra's conference call,[2] Defendant Connolly also spoke to

the manifold benefits Conagra shareholders could expect from the acquisition:

…our agreement to acquire Pinnacle Foods builds on the strong foundation we've established and serves as a catalyst to accelerate value creation for shareholders. It will enhance our scale by combining two growing portfolios of iconic brands and create a leader in frozen foods, while also expanding our presence in snacks. We are bringing together two highly complementary companies, with a strong combined balance sheet, positioning us to capture compelling financial benefits, including attractive synergies.

* * *

In addition to our complementary portfolios, ConAgra and Pinnacle have similar results-oriented cultures. We believe Pinnacle will be an excellent cultural and operational fit. When coupled with our proven track record of executing strategic transactions, we will be able to implement a smooth integration process.

### *August 9, 2018 Proxy Statement*

92.     The Company filed its 2018 Proxy Statement with the SEC on August 9, 2018.

The Director-Defendants solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of

the Exchange Act, which contained material misstatements and omissions.[3]

---

[2] Full transcript available at https://www.fool.com/earnings/call-transcripts/2018/07/02/conagra-brands-inc-cag-q4-2018-earnings-conference.aspx. Last visited July 16, 2019.

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

93. The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

94. The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay for performance" elements, including equity awards designed to: "align the interests of [its] executive officers with the long-term interests of [its] shareholders," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

95. The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company did not conduct sufficient due diligence before acquiring Pinnacle; (2) Pinnacle's top brands were weakening due to internal problems of innovation and execution rather than external market pressures; (3) Pinnacle's situation was so desperate that it had been reduced to offering its retailers discounts to improve its sales figures; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *September 4, 2018 Barclays Global Consumer Staples Conference*

96. On September 4, 2018, Defendant Connolly spoke on behalf of the Company in a question and answer session at the Barclays Global Consumer Staples Conference, calling the acquisition of Pinnacle "a no brainer" and touting Pinnacle's Birds Eye brand as "an absolutely terrific business. It's been a juggernaut, and it's incremental to what we do. And by the way, we think it opens up opportunities for us to apply some of our brands in that space…":

97. Defendant Connolly went on at length about the great fit and complementary portfolio that Pinnacle brought to the acquisition, stating, in relevant part:

> With respect to Pinnacle, this is as much of a no brainer of a deal as I think you're ever going to see. I don't know that you'll see any large deal that looks this much like a bolt-on as Pinnacle does. This is a company that is very similar in their core to what we do in our core, the more types of businesses and very similar culturally. Lots of things we like about the portfolio, we like the margin structure on some of the grocery businesses. We like the growth prospects in frozen. But obviously, the thing we like most about it is that it comes back to our unshakable belief that frozen is a space that has call it 10 years or more of runway. And when you look at Pinnacle's portfolio versus our portfolio, what you see are terrific assets that are not redundant to what we do, they're additive and incremental to what we do.

98. Andrew Lazar, a Barclays analyst, asked Defendant Connolly directly about Conagra's due diligence process for the acquisition:

> I think there's some that think that, because Pinnacle 'settled' for a $68 price, which was below what I think many of the investment community might have expected, that there must be something wrong with Pinnacle's fundamentals so that the outlook is somehow compromised. It did not seem that way as you just mentioned to us based on the second quarter results for Pinnacle, but again, love your thoughts on this more broadly, and then maybe pivoting into sort of the due diligence done on the deal and what that told you and how you got comfortable with their internal projections."

99. Defendant Connolly's response was a vague assurance that Conagra, as a veteran in the food industry, had expertise and had gone into the deal "clear-eyed":

> Yeah. I think the way to think about this is we've been looking at this for a while. And we know food businesses. We've been spending our whole career in the food industry. So, we've been very clear-eyed from the beginning as to what the synergy prospects were with this company and what we believed were the true perpetual growth rates that were tangible for this company going forward. And we use those assumptions to arrive at a valuation that we thought was fair and reasonable.

100. When asked about Pinnacle's underwhelming retail 'scanner' data, or information collected from barcode scans at checkout, Defendant Connolly stated that he "wouldn't worry

too much around a lack of focus around deal dynamics because one of the things that you've seen with Pinnacle is this is a true performance-oriented team."

### September 27, 2018 Form 8-K, Press Release, and Conference Call

101.    On September 27, 2018, Conagra released its financial results on a current report filed with the SEC on a Form 8-K ("September 2018 8-K") for the quarterly period ended August 26, 2018, to which it attached a corresponding press release as an exhibit.

102.    Later that day, the Company held a conference call to discuss its first quarter financial results.[4] Defendant Connolly touched on Pinnacle's "strong portfolio of frozen brands" and offered that Conagra's "proven approach to innovation and brand building" rendered it "well positioned to accelerate the next wave of change with the addition of Pinnacle Foods," and "to enhance [Pinnacle's] portfolio of leading brands."

### October 9, 2018 Second Public Offering

103.    On October 9, 2018, Conagra issued a press release to publicize its SPO, an endeavor meant to help fund the enormous cost of the Pinnacle acquisition. The Company announced that it would sell approximately 16.3 million shares of common stock at a price of $35.25 per share, with an option for underwriters to purchase another 1.6 million shares.

104.    Also on October 9, 2018, Conagra filed its registration and prospectus on a Form S-3 with the SEC, filing a prospectus supplement on October 11, 2018 that was also dated October 9, 2018 (collectively, the "SPO Documents"). The Form S-3 was signed by the Director-Defendants, as well as Defendants Marberger and Wise, and non-defendant Colleen R. Batcheler. These documents incorporated by reference, *inter alia*, the June 2018 8-K and the

---

[4] Full transcript available at https://www.fool.com/earnings/call-transcripts/2018/09/27/conagra-brands-inc-cag-q1-2019-earnings-conference.aspx. Last visited July 16, 2019.

various "Compelling Strategic and Financial Benefits" and sales benefits of the merger touted therein, stating:

> The transaction will enhance Conagra Brands' multi-year transformation plan and expand its presence and capabilities in its most strategic categories, including frozen foods and snacks. With annual net sales in excess of $3 billion, Pinnacle Foods' portfolio of frozen, refrigerated and shelf-stable products includes such well-known brands as Birds Eye, Duncan Hines, Earth Balance, EVOL, Erin's, Gardein, Glutino, Hawaiian Kettle Style Potato Chips, Hungry-Man, Log Cabin, Tim's Cascade Snacks, Udi's Vlasic and Wish-Bone, among others. Based on both companies' latest fiscal year results, pro forma net sales would have been approximately $11 billion.

105.    The press release also featured new statements from Conagra's management, which continued to promote the "addition of Pinnacle Foods' leading brands in the attractive frozen foods and snacks categories [which] will create a tremendous opportunity for us to further leverage our proven innovation approach, brand-building capabilities, and deep customer relationships. With greater scale across leading, iconic brands, an unwavering focus on driving profitable growth, and a strong balance sheet and cash flow, we are crashing a tremendous platform to drive meaningful shareholder value."

106.    Finally, the SPO Documents addressed Pinnacle's financial results for its quarterly period ended September 30, 2018, stating that:

> Pinnacle expects net sales to be in the range of $740 million to $745 million, compared with net sales of $749.8 million in the third quarter of 2017. *The approximately 1% decline in sales is primarily due to intensified competition*, specifically in Pinnacle's Grocery segment, partially offset by ongoing growth in Pinnacle's Frozen segment, led by the Birds Eye franchise, which continued to drive Pinnacle's robust innovation program.

(Emphasis added).

107.    The statements in ¶¶ 88-91 and 96-106 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: that: (1) the Company did not conduct sufficient due diligence before acquiring Pinnacle; (2)

30

Pinnacle's top brands were weakening due to internal problems of innovation and execution rather than external market pressures; (3) Pinnacle's situation was so desperate that it had been reduced to offering its retailers discounts to improve its sales figures; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

108. On October 26, 2018, Conagra announced the completion of its acquisition of Pinnacle, which survived as a wholly-owned subsidiary of Conagra.

### The Truth Emerges

109. On December 20, 2018, Conagra released its financial results for the fiscal quarter ended November 25, 2018 on a Form 10-Q filed with the SEC ("2Q19"). Therein Conagra admitted the disappointing performance of Pinnacle post-acquisition, disclosing that the difficulties were not due to competition, but were caused by internal problems such as a lack of innovation and "highly inefficient" promotions that hampered Pinnacle's sales performance.

110. The 2Q19 revealed that for the full month (31 days) after the acquisition, Pinnacle had only $259 million in net sales, a figure that Defendant Connolly, in a conference call later that day, admitted to be "below expectations due to weak performance across a range of significant brands," where "growth stalled." The "deterioration in the legacy Pinnacle business over the course of the calendar year 2018" was particularly attributable to difficulties with Pinnacle's top three brands—Bird's Eye, Duncan Hines, and Wish-Bone—which, despite being so often touted pre-acquisition, "suffered sales and distribution losses." According to Defendant Connolly, it was these three brands that had brought "the vast majority of Pinnacle's current challenges," because "Pinnacle overextended new items in the same demand pools, favored high margins over high-quality and highly competitive products and missed some major consumer

trends." This overextension was attributed to "innovation [that] was insufficient to sustain growth, primarily because it was subpar in its execution."

111.    Defendant Connolly also backtracked from Conagra's pre-acquisition explanation of Pinnacle's difficulties, admitting now that "the challenges that the Pinnacle businesses face have been largely self-inflicted due to subpar innovation and executional missteps" that "ultimately undermined brand strength and pricing power." Finally, Defendant Connolly admitted that he did not "expect a material improvement in Pinnacle's underlying trends until the second half of Conagra's fiscal 2020," and that Pinnacle's sales for calendar year 2018 (Pinnacle's original fiscal year) would only reach "roughly $3 billion, which is about $160 million or 5% below Pinnacle's target."

112.    Traditionally, "Pinnacle's gross margin performance was lower in the front half of the calendar year than the back half," rendering its lackluster end of year performance in 2018 "highly disappointing…" Conagra went on to estimate that for the seven months in its fiscal 2019 that will include Pinnacle, the latter's "net sales will be down mid-single digits for our fiscal year 2019 versus the same period a year ago. This equates to $1.7 billion to $1.75 billion in Pinnacle's net sales for the 7-month period."

113.    In explanation for these disappointing results and forecasts, Defendant Connolly pointed to "negative consumption trends in the Pinnacle business, along with an estimated $30 million of negative net sales impact from our post-decision to exit some low [return on investment year-end] price promotions." He went on to characterize these promotions as "chasing volume over value" and "highly inefficient," comments that *The Wall Street Journal* described as "a nice way of saying they pushed excess inventory to retailers prior to the deal that was ultimately difficult to sell."

114.    In the conference call, many analysts were unconvinced by this explanation, including a JP Morgan analyst who questioned "why Pinnacle's performance worsened so suddenly" and if Conagra's "due diligence could have been better," adding that "this feels like a really big surprise to most of us, something that maybe could have been a little bit avoided." Defendant Connolly's reply belied the Company's lack of thorough review, stating that "there's only so much you can see in a public company diligence... Pinnacle is not a brand. It's a diverse company of brands. And so there were obviously businesses that were often businesses that were down, we were smack dab in the middle of diligence."

115.    In a discussion with a Barclays analyst, who characterized the state of Pinnacle as "seem[ing] far more severe," than Conagra's management had initially given analysts to believe, Defendant Connolly only offered that the Company, having "coveted [Pinnacle's] portfolio for a while," had "concluded [that] the acquisition would deliver high, single digit EPS accretion," and had no choice but to seize the chance to purchase Pinnacle. Due to this misplaced optimism, however, Defendant Connolly went on to admit that the Company's "original EPS accretion guidance for this transaction" will not accrue until Conagra's fiscal year 2022.

116.    Also on December 20, 2018, JP Morgan released an analyst report condemning Conagra's obvious deficiencies in its pre-acquisition due diligence, stating that "CAG management should have performed better due diligence" before acquiring Pinnacle, especially given that Conagra almost certainly "had industry sources (customers, *e.g.*) that could have set off warning flares months ago." Speaking to the market reaction, JP Morgan commented that "the lack of visibility CAG recently had into [Pinnacle's] pending distribution losses is what (we think rightfully) irks many observers today," causing "some investors [to be] spooked and unwilling to look at CAG for a while." Market observers were shocked to note that "the erosion

of Pinnacle's business was so big (and happened so fast)" and that the opinion of Conagra's management had shifted so quickly, remarking that they "cannot recall a CEO so deeply criticizing the decisions made within a business acquired only two months prior."

117.    CFRA also published a report on December 20, 2018, commenting on the earnings call and the quarterly results. Analyst Paige Marcus opined that the Company's "[d]ialogue on this morning's earnings call suggested lax due diligence performed during the Pinnacle transaction, with improvement needed for Pinnacle's Birds Eye, Duncan Hines, and Wish-Bone brands."

118.    On this news, the Company's price per share dropped from a closing price of $29.09 on December 19, 2018 to a closing price of $24.28 on December 20, 2018, a decline of over 16%.

119.    The next day, on December 21, 2018, RBC Capital Markets published their own analyst report, also noting Conagra's "litany of previously-unknown execution issues in the acquired Pinnacle business." Considering that "many [had] viewed Pinnacle as the vanguard of innovation and execution within U.S. Food, we were surprised to hear that its franchise BirdsEye brand now faces high-single-digit distribution losses along with accelerating double-digit sales declines from the Duncan Hines and Wish-Bone brands."

120.    Conagra's stock price dropped another $2.13 to close at $22.15 on December 21, 2018. Overall, the Company's stock price fell $8.13 (28%) over three trading days, to close at $20.96 on December 24, 2018.

## DAMAGES TO CONAGRA

121.    As a direct and proximate result of the Individual Defendants' conduct, Conagra has lost and expended, and will lose and expend, many millions of dollars.

122.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, its CFO, its controller, and most of its directors, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123.     Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

124.     As a direct and proximate result of the Individual Defendants' conduct, Conagra has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

125.     Plaintiff brings this action derivatively and for the benefit of Conagra to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Conagra, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

126.     Conagra is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

127.     Plaintiff is, and has continuously been at all relevant times, a shareholder of Conagra. Plaintiff will adequately and fairly represent the interests of Conagra in enforcing and

prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

128.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

129.    A pre-suit demand on the Board of Conagra is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Arora, Brown, Butler, Connolly, Gregor, Johri, Lenny, Marshall, and Omtvedt (the "Director-Defendants"), in addition to non-defendants Scott Osfeld and Melissa Lora (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors that were on the Board at the time this action was commenced.

130.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them engaged in insider sales based on material non-public information, netting proceeds of over $216,084, which renders her unable to impartially investigate the charges and decide whether to pursue action against herself and the other perpetrators of the scheme.

131.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of

the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

132.    According to the 2018 Proxy Statement and the Audit/Finance Committee Charter, the entire Board has the ultimate oversight responsibility, though the Audit/Finance Committee is primarily responsible for monitoring the integrity of the Company's financial reporting and risk management. Conagra stated the following in the 2018 Proxy Statement:

**Primary Responsibilities**
- Oversee the integrity of the company's financial statements and review annual and quarterly SEC filings and earnings releases
* * *
- Receive reports on the activities of management's Enterprise Risk Management Committee and Risk Oversight Committee, as well as on the company's processes for overseeing financial risks, including management's assessment and control of derivative and treasury risks
- Review the company's compliance with legal and regulatory requirements
- Review the company's strategies and plans related to capital structure, including borrowing, liquidity, and allocation of capital

Clearly, Defendants Arora, Brown, Butler (Chair of the Committee), Gregor, and Omtvedt, as Audit/Finance Committee members during the Relevant Period, failed to uphold their duties to fully and adequately assess risks to the Company and to ensure full and accurate disclosures.

133.    Additional reasons that demand on Defendant Connolly is futile follow. Defendant Connolly has served as Conagra's President and CEO, as well as a Company director, since April 6, 2015, and he serves as a member of the Executive Committee. Thus, as the Company admits, he is a non-independent director. Conagra provides Defendant Connolly with his principal occupation, and he receives handsome compensation, including over $10.47 million during the fiscal year ended May 27, 2018. Defendant Connolly personally made many of the false and misleading statements, including those in the conference calls and the Barclays Global Consumer Staples Conference. As the Company's highest officer and as a trusted Company

director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, his failure to provide full and honest public disclosures, and to avoid and report all violations of law, violated Conagra's Officer Code of Ethics. For these reasons, too, Defendant Connolly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Arora is futile follow. Defendant Arora has served as a Company director since July 17, 2018 and serves as a member of the Audit/Finance Committee. As a trusted Company director and Audit/Finance Committee member, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

135.    Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown has served as a Company director since October 15, 2013 and serves as a member of the Audit/Finance Committee. Defendant Brown receives handsome compensation, including $249,650 during the fiscal year ended May 27, 2018. As a Company director and Audit/Finance Committee member he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Brown breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Butler is futile follow. Defendant Butler has served as a Company director since May 16, 2003 and serves as the Chair of the Audit/Finance Committee and as a member of the Executive Committee. Defendant Butler receives handsome compensation, including $279,650 during the fiscal year ended May 27, 2018. As a Company director and Chair of the Audit/Finance Committee he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Butler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Gregor is futile follow. Defendant Gregor has served as a Company director since February 6, 2009. She also serves as the Chair of the Nominating, Governance and Public Affairs Committee and as a member of the Audit/Finance Committee and the Executive Committee. Defendant Gregor receives handsome compensation, including $264,150 during the fiscal year ended May 27, 2018. As a Company director and Audit/Finance Committee member she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too,

Defendant Gregor breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Johri is futile follow. Defendant Johri has served as a Company director since January 1, 2009 and serves as a member of the Nominating, Governance and Public Affairs Committee and the Human Resources Committee. Defendant Johri receives handsome compensation, including $259,650 during the fiscal year ended May 27, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Johri breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Lenny is futile follow. Defendant Lenny has served as a Company director since March 17, 2009 and as the Board's Chairman since May 28, 2018. He also serves as a member of the Nominating, Governance and Public Affairs Committee and the Human Resources Committee and as the Chair of the Executive Committee. Defendant Lenny receives handsome compensation, including $279,650 during the fiscal year ended May 27, 2018. As a Company director and as Chairman of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Lenny breached his fiduciary duties, faces a substantial

40

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.    Additional reasons that demand on Defendant Marshall is futile follow. Defendant Marshall has served as a Company director since May 23, 2007. She also serves the Chair of the Human Resources Committee and as a member of the Executive Committee and the Nominating, Governance and Public Affairs Committee. Defendant Marshall receives handsome compensation, including $279,650 during the fiscal year ended May 27, 2018. As a Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales before the fraud was exposed, which yielded at least $216,084 in proceeds, demonstrate her motive in facilitating and participating in the fraud. For these reasons, too, Defendant Marshall breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Omtvedt is futile follow. Defendant Omtvedt has served as a Company director since November 11, 2016 and is a member of the Audit/Finance Committee. Defendant Omtvedt receives handsome compensation, including $259,650 during the fiscal year ended May 27, 2018. As a Company director and Audit/Finance Committee member he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Omtvedt breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142. Additional reasons that demand on the Board is futile follow.

143. As described above, one of the Director-Defendants directly engaged in insider trading, in violation of federal law. Defendant Marshall received proceeds of over $216,084 as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to her, and thus excused.

144. The Director-Defendants have longstanding business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

145. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

146. Conagra has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against

themselves or others who were responsible for that wrongful conduct to attempt to recover for Conagra any part of the damages Conagra suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

147.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

148.    The acts complained of herein constitute violations of fiduciary duties owed by Conagra officers and directors, and these acts are incapable of ratification.

149.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Conagra. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Conagra, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an

insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

150.     If there is no directors' and officers' liability insurance, then the Directors will not cause Conagra to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

151.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM FOR RELIEF

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

152.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

154.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

155. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

156. Under the direction and watch of the directors, the 2018 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company did not conduct sufficient due diligence before acquiring Pinnacle; (2) Pinnacle's top brands were weakening due to internal problems of innovation and execution rather than external market pressures; (3) Pinnacle's situation was so desperate that it had been reduced to offering its retailers discounts to improve its sales figures; and (4) the Company failed to maintain internal controls. The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards designed to "align the interests of [its executive officers with the long-term interests of [its] shareholders" while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

157. The 2018 Proxy Statement also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider

trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The 2018 Proxy Statement failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

158. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the advisory approval of executive compensation.

159. The false and misleading elements of the 2018 Proxy Statement led to the re-election of the Director-Defendants, which allowed them to continue breaching their fiduciary duties to Conagra.

160. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

161. Plaintiff on behalf of Conagra has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Against Individual Defendants for Breach of Fiduciary Duties

162. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Conagra's business and affairs.

164.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

165.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Conagra.

166.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

167.    In further breach of their fiduciary duties owed to Conagra, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company did not conduct sufficient due diligence before acquiring Pinnacle; (2) Pinnacle's top brands were weakening due to internal problems of innovation and execution rather than external market pressures; (3) Pinnacle's situation was so desperate that it had been reduced to offering its retailers discounts to improve its sales figures; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

168.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

169.    In breach of their fiduciary duties, one of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

170.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

171.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

172.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

173.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Conagra has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

174.     Plaintiff on behalf of Conagra has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### Against Individual Defendants for Unjust Enrichment

175.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Conagra.

177.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Conagra that was tied to the performance or artificially inflated valuation of Conagra, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

178.     Plaintiff, as a shareholder and a representative of Conagra, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

179.     Plaintiff on behalf of Conagra has no adequate remedy at law.

49

## FOURTH CLAIM FOR RELIEF

### Against Individual Defendants for Waste of Corporate Assets

180.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

182.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

183.    Plaintiff on behalf of Conagra has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Conagra, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Conagra;

(c)    Determining and awarding to Conagra the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Conagra and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Conagra and its shareholders from a repeat of the damaging events

described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2. a provision to permit the shareholders of Conagra to nominate at least six candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)    Awarding Conagra restitution from the Individual Defendants, and each of them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

    Plaintiff hereby demands a trial by jury.

Dated: July 22, 2019           Respectfully submitted,

               /s/ Carl V. Malmstrom
              **WOLF HALDENSTEIN ADLER**
               **FREEMAN & HERZ LLC**
              111 W. Jackson St., Suite 1700
              Chicago, IL 60604
              Tel: (312) 984-0000
              Fax: (212) 686-0114
              malmstrom@whafh.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*